[3] See United States v Fisher, 7 USCMA 270, 22 CMR 60.

UNITED STATES, Appellee

v

JAMES W. WISE, Sergeant, U. S. Marine Corps, Appellant

10 USCMA 539, 28 CMR 105

*Lieutenant (jg) Frederick A. Cone,* USNR, argued the cause for Appellant, Accused.

*Major George M. Lilly,* USMCR, argued the cause for Appellee, United States.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of unauthorized absence from December 9, 1957, to January 7, 1958 (Charge I); bigamy (Charge II); and nine specifications of forging the signature of his wife, Evelyn B. Wise, to dependency allotment checks (Charge III), in violation, respectively, of Articles 86, 134 and 123, Uniform Code of Military Justice, 10 USC §§ 886, 934 and 923. The court adjudged a sentence which included a dishonorable discharge and confinement at hard labor for five years. The board of review affirmed the findings of guilty, but mitigated the sentence by reducing the discharge to a bad-conduct discharge and the period of confinement to one year. We granted review to consider whether the accused's wife was properly allowed to testify against him.

According to the evidence, while stationed in Hawaii the accused met Evelyn at a bar in September 1956. He started to date her. They quarreled and broke up on October 14th. A few days later they "started going with each other again" until November 2d, when once more they quarreled and separated. On November 4th, Evelyn called the accused to say she had "something very important to tell" him. He met her and learned that she was pregnant. The accused agreed to marry her. He re-enlisted in the Marine Corps in order to extend his tour of duty in Hawaii. On November 17th he married Evelyn. She had been previously married and had three children. About ten days after the marriage, Evelyn decided to find out "if she loved Louie more than" the accused; Louie had been her boy friend. Shortly thereafter the accused came home early one evening to discover Evelyn in a negligee and Louie on the couch. He picked up his things and returned to the Base to stay.

In January 1957, the accused received the first allotment check. He took it to Evelyn. Both went to the YMCA and had the check cashed. A second check, dated January 31, was given to Evelyn and cashed by her. Shortly afterwards, the accused went to the Crystal Ballroom to talk to Evelyn. He wanted her "to come back." Apparently in the course of the conversation, Evelyn became ill. She told the accused she had had an "illegal abortion." The accused took her home. On March 4th or 5th, he received the third allotment check dated February 28th. He went to the Crystal Ballroom to find Evelyn. On this occasion he learned from her that she didn't love him and that she had married him only because she wanted to "prove" to Louie that she could marry another man. Evelyn also told the accused the "baby" had not been his, but Louie's. The argument between them became "hot and heavy." The allotment checks were part of the subject matter of the argument. The accused testified that Evelyn told him she "didn't give a damn" about what he did with the checks. In her own deposition testimony Evelyn admitted she told the accused he could do whatever he wanted with the allotment checks; allotment checks or no, she just wasn't "coming back" to live with him.[1]

---

[1] Some of Evelyn's testimony on this point is as follows:

"Q. He told you he was going to stop your allotment?

About two weeks after their argument in the Crystal Ballroom, Evelyn met the accused in the Circus Room. She told him her children were sick and that she wanted money for the doctor. She asked for, and was given, forty-five dollars from the proceeds of the February allotment check which the accused had "just cashed."

After the Circus Room meeting, the accused did not see Evelyn again in Hawaii. In April 1957, he learned she had used the money he had given her to go, with Louie, to Santa Monica, California. In May, the accused was transferred to California. He went to his home in Pennsylvania on a thirty-day leave. On his return, he went to Santa Monica and talked to Evelyn. The nature of their discussion is not disclosed. In January 1958, Evelyn came to the accused and asked if he "wouldn't come back to her." He refused. That same month, Evelyn replied to a letter from accused's counsel. "[A]s far as I am concerned," she said, "it was all right for my husband to cash my checks." She also said she wanted "to drop all charges." At that time Evelyn was again receiving allotment checks. Nevertheless, in a deposition taken on April 22, 1958, Evelyn testified that she did not endorse any of the checks set out in the specifications of Charge III and she did not authorize the accused to sign her name. The accused admitted he signed his wife's name and, in some instances, also endorsed the checks in his own name. The checks which are alleged to have been forged are as follows:

February 28, 1957, $91.30; March 31, 1957, $91.30; April 30, 1957, $91.30; May 31, 1957, $91.30; June 30, 1957, $91.30; July 31, 1957, $91.30; August 31, 1957, $91.30; August 31, 1957, $45.80 (difference between $91.30 and increased amount of $137.10); September 30, 1957, $137.10.

The general rule is that one spouse may not, over objection, testify against the other in a criminal prosecution. United States v Wooldridge, 10 USCMA 510, 28 CMR 76. There are exceptions to the rule. The early common law recognized as exceptions cases of personal violence by one spouse against the other. Over the years other exceptions were added by statute and court decisions. The present Manual provides as follows:

". . . This privilege does not exist, however, when the husband or wife is the individual or one of the individuals injured by the offense with which the other spouse is charged, as in a prosecution for an assault upon one spouse by the other, for bigamy, polygamy, unlawful cohabitation, abandonment of wife or children or failure to support them, for using or transporting the wife for 'white slave' or other immoral purposes, or for forgery by one spouse of the signature of the other to a writing when the writing would, if genuine, apparently operate to the prejudice of such other." [Manual for Courts-Martial, United States, 1951, paragraph 148e, page 277.]

In United States v Strand, 6 USCMA 297, 304, 20 CMR 13, we noted that the Manual's enumeration of offenses in which the general rule does not apply "is illustrative, not exclusive." As regards bigamy, the Manual statement is firmly grounded in precedent. In 1887 Con-

---

"A. That's right.
"Q. And you said 'fine go ahead'?
"A. I thought he could do it.
"Q. Did you say 'fine go ahead'?
"A. No I didn't say . . . . .
"Q. . . . that's fine go ahead.
DC: Let the witness finish her answer, please.
"WIT: I said he . . . if that's the way it has to be, go ahead, because . . . . . .

"QUESTIONS BY THE DEFENSE.
"Q. . . . . . . you weren't going back and live with him?
"A. That's right.
"Q. Allotment check or no allotment check you weren't going to live with him?
"A. That's right.
"Q. So you told him 'You can do what ever you want to with them'?
"A. (Nodding affirmatively) That's right."

**541**

gress provided that "in any prosecution for bigamy . . . under any statute of the United States" one spouse is a "competent witness" against the other but could not be "compelled to testify . . . without the consent" of the other. Act of March 3, 1887, chapter 397, 24 Stat 635, 28 USC § 633 (1940ed). The statute remained in effect more than half a century. In 1948 it was not included in the revision of Title 28 of the United States Code. A few years earlier, however, Congress had empowered the Supreme Court to promulgate rules of procedure in criminal proceedings. 18 USC § 687. Rule 26 of the Federal Rules of Criminal Procedure, promulgated by the Supreme Court, says that unless otherwise provided by act of Congress or other rule, the competency of a witness is determined by the "principles of the common law as they may be interpreted . . . in the light of reason and experience." The notes of the Advisory Committee assisting in the preparation of the Rules show that Rule 26 continued the existing statutes governing the competency of witnesses. See 18 USC § 687, Rule 26 Notes. It seems highly unlikely that when Congress omitted Section 633 from the 1948 Revision of Title 28, it intended the Federal courts to discard an exception which had prevailed for so long a time. Rather, in our opinion, Section 633 was omitted for the simple reason that a half century of experience under the statute had fixed the exception as a rule of evidence within Rule 26. We hold, therefore, that the accused's wife was a competent witness and could voluntarily testify against him on the bigamy charge.

A more difficult question is presented by the forgery offenses. In United States v Wooldridge, supra, we reviewed the same issue. We noted that several courts which considered the matter concluded the spouse whose signature was forged was not competent to testify against the other. We did not decide whether a different rule obtains in the military because of the Manual provision, or whether "in the light of reason and experience" such other rule should apply. In that case, as here, the for-

gery was of a dependency allotment check made out to the wife. We pointed out that a material part of the check represents a deduction from the basic pay of the serviceman-husband. That circumstance and the fact of the accused's status as a husband give him a substantial interest in the check and its proceeds.

In this case, undisputed evidence shows the accused's wife refused to live with him, and told him he could do whatever he pleased about the allotment. The wife's own testimony shows she renounced all interest in the February check and its proceeds, and did not expect to receive any more checks. Therefore, signing her name to the checks did not constitute an injury to her. Consequently, as to the forgery specifications, the defense objection to the competency of the wife to testify against the accused was erroneously overruled. The error requires reversal of the findings of guilty of the nine specifications under Charge III.

The findings of guilty of Charge III and its specifications are set aside, and those charges are dismissed. The sentence is set aside. The record of trial is returned to The Judge Advocate General of the Navy for reference to a board of review for reassessment of the sentence on the basis of the remaining findings of guilty.

Judge FERGUSON concurs.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

Accused pleaded guilty to the charge of unauthorized absence, and as to the bigamy count there can be no doubt that the deposed testimony of his wife was properly admitted against him. Paragraph 148e, Manual for Courts-Martial, United States, 1951; Wigmore, Evidence, 3d ed, § 2239 (3). See also United States v Leach, 7 USCMA 388, 22 CMR 178. Accordingly, I agree there is no infirmity in accused's convictions for the aforementioned offenses. From the remainder of the majority opinion, however, I must disassociate myself.

542

In the recent case of United States v Wooldridge, 10 USCMA 510, 28 CMR 76, I set forth in my separate ■■■ opinion my view that forgery of a spouse's allotment check indeed constitutes an injury to her, thus bringing her testimony within the exception to the general rule of privilege. That reasoning is equally applicable in the case at bar. I sense in this instance, however, that additional matters have been injected upon which I desire to make my position clear. First, the facts concerning the wife's bad character were furnished solely by the accused in his attempt to justify his forgeries and under trial conditions which allowed no rebuttal. Even if true, they are irrelevant to any issue before us for the reason that immorality does not affect authorization or need for living expenses. Second, the majority opinion may leave the impression that the accused's wife authorized him 'o endorse her checks. Obviously, if that were true, the endorsement would not be forged, and thus, as to the Article 123 offenses, we would never reach the question upon which we granted review. Brief reference to the record makes it clear there was no consent.

As to each check, accused's wife testified unequivocally that the endorsements were not hers and that she authorized no one to endorse the checks, and she specifically stated she had never authorized accused to sign her name on any document. And apart from his incriminating pretrial statements, accused took the stand in his own behalf. He not only judicially admitted endorsing the checks with her signature and cashing them, but also admitted his wife never told him he could place her endorsement on any check. Nor does the wife's statement to accused that he could do with the checks as he liked provide a foundation for consent. She had already categorically denied granting authority, and her testimony that she told accused she didn't care what he did with the checks must be considered in light of the fact that immediately preceding this statement he had informed her he was going to stop her allotment and return the checks "back to Washington," which she believed he could do and which led her to believe she would not receive any more checks. Manifestly, when the testimony is taken in context, there can be no claim that accused had authority. Rather he at best raised an issue of honest mistake of fact, which defense was properly instructed upon and rejected by the triers of fact.

Thus, the only question here involved is that of the husband-wife privilege and, for the reasons I set forth in the *Wooldridge* case, supra, I conclude accused's wife was indeed an injured party. Accordingly, I find her testimony as to the forgeries to have been properly admitted against him.

I would affirm the decision of the board of review.